AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| | ) Case No.   23-MR-687 |
| TARGET DEVICES, currently located at FBI Farmington | ) |
| Resident Agency, 215 W. Elm Street, Farmington, NM, | ) |
| 87401, fully described in Attachment A | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S. Code§ 1153 | Offenses committed within Indian Country |
| 18 U.S. Code§ 2241(c) | Aggravated sexual abuse |
| 18 U.S. Code§ 2244(a)(5) | Abusive sexual contact |

The application is based on these facts:

See attached affidavit, submitted by SA Travis Kosir and approved by Supervisory AUSA Elisa Dimas

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

FBI Special Agent Travis Kosir
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ subscribed electronically, sworn telephonically _____ *(specify reliable electronic means)*

Date:   3/30/2023
_____
*Judge's signature*

City and state:  Farmington, NM

B. Paul Briones, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>TARGET DEVICES, CURRENTLY LOCATED AT FBI FARMINGTON RESIDENT AGENCY, 215 W. ELM STREET, FARMINGTON, NM, 87401, AND MORE FULLY DESCRIBED IN ATTACHMENT A. | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Travis A. Kosir, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described in Attachment A—multiple electronic devices—which are currently in law enforcement possession at the Farmington Resident Agency, 215 W. Elm Street, Farmington, NM 87401, and the extraction from that property of electronically stored information described in Attachment B. This affidavit in support of an application for a search warrant applies to eleven electronic devices (referred to herein as the "TARGET DEVICES") collected during the execution of United States District Court, District of New Mexico, search warrants Case No. 23-MR-586 and Case No. 23-MR-587 at two residences located in vicinity of GPS coordinates N36.714077 W108.495567 on March 16, 2023.

2.       I am a Special Agent of the Federal Bureau of Investigation ("FBI"), where I have been employed in that capacity since March 2016. I am currently assigned to the Albuquerque

1

Division of the FBI, Farmington Resident Agency, and have primary investigative responsibility for crimes that occur in Indian Country, including violent crimes such as homicide, robbery, arson, aggravated assault, and sexual assault. I have knowledge and experience in conducting such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, tribal, state, and federal law enforcement agencies. As a Federal Agent, I am authorized to investigate violations of the laws of the United States and have authority to execute arrest and search warrants issued under the authority of the United States.

3.      My investigative training and experience includes, but is not limited to, conducting surveillance, interviewing subjects, writing affidavits for search and arrest warrants, collecting evidence and learning legal matters which includes the topics of fourth amendment searches. I have experience executing and examining data from multiple search warrants on electronic devices and am familiar with the type of data stored on electronic devices. I have training and experience conducting investigations involving the use of electronic devices, websites, social media, and other forms of electronic communication, including the identification and use of IP addresses in determining user identities, geographic locations, and linked accounts.

4.      The information set forth in this affidavit has been derived from an investigation conducted by the Farmington Resident Agency of the FBI, the Navajo Nation Department of Criminal Investigations ("NNDCI"), the Navajo Police Department ("NPD"), and the San Juan County Sheriff's Office ("SJCSO").

5.      This affidavit is based upon information from my personal observations, my training and experience, and information reported to me by other federal, state, local, and tribal law enforcement officers during the course of their official duties. Throughout this affidavit,

reference will be made to law enforcement officers. Law enforcement officers are those federal, state, local, and tribal law enforcement officers who have directly participated in this investigation.

6.      This investigation concerns alleged violations of United States Code Title 18 §1153 – Offenses committed within Indian country, §2241(c) - Aggravated sexual abuse and §2244(a)(5) - Abusive sexual contact.

7.      This affidavit is intended to show there is probable cause for the requested search warrant and does not set forth all my knowledge about this matter. The statements in this affidavit are based on my personal knowledge, information that I have received from other law enforcement personnel, and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to obtain the requested search warrant.

## INDIAN COUNTRY JURISDICTIONAL STATEMENT

8.      The alleged victim in this investigation, identified by initials D.M. and year of birth 2013 (referred to herein as "JANE DOE"), is an enrolled member of the Navajo Nation Tribe.

9.      R. MAYS and D. MAYS are both enrolled members of the Navajo Nation Tribe.

10.     The locations of the alleged crimes are located within the exterior boundaries of the Navajo Nation Indian Reservation.

11.     The Navajo Nation is a federally recognized Indian Tribe.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

12.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the TARGET

DEVICES described in Attachment A, which are currently in the possession of the FBI at the Farmington Resident Agency, 215 W. Elm Street, Farmington, NM 87401.

13.     This affidavit in support of an application for a search warrant applies to the following TARGET DEVICES, listed below and described in Attachment A, as well as any and all storage devices contained within the TARGET DEVICES such as SIM cards, SD cards, or other removable digital storage devices, collected during the execution of United States District Court, District of New Mexico search warrants Case No. 23-MR-586 and Case No. 23-MR-587 at two residences located in vicinity of GPS coordinates N36.714077 W108.495567 on March 16, 2023. TARGET DEVICE "a" listed below, identified as a Pixel 2 XL smartphone, was collected from the residence of R. MAYS (search warrant Case No. 23-MR-586). All other TARGET DEVICES listed below were collected from the residence of D. MAYS (search warrant Case No. 23-MR-587).

      a.     Pixel 2 XL smartphone, IMEI: 358035086070350

      b.     iPhone SE, serial number LXD4J40X25, IMEI: 357933319711793

      c.     TCL flip phone, model 4056SPP, IMEI: 015855002901775

      d.     Samsung cell phone, model SGH-S125G (GP), serial number R21D421LHTL, IMEI: 356727/05/064857/3

      e.     LG flip phone, model LG-VN251SNPP, serial number 410CYPY0117032

      f.     Sky Devices smartphone, model Elite D5 Max, IMEI 1: 354403390221487

      g.     Amgoo cell phone, model AM242, IMEI 1: 357638060870777, IMEI 2: 357638060870785

      h.     Blu cell phone, model C5L, serial number 5090018021050227, IMEI 1: 355449106835325, IMEI 2: 355449106835333

i.      PCD cell phone, model P41, serial number P412201001607, IMEI: 352781120066153

j.      Unnecto cell phone, model U618 Quattro M2, IMEI 1: 356814082107917, IMEI 2: 356814082107925

k.      Samsung smartphone, IMEI: 354762612095445

14.    The applied-for warrant would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## JURISDICTION

15.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed above, acts or omissions in furtherance of the offenses under investigation occurred within Indian Country in the District of New Mexico. *See* 18 U.S.C. § 1153.

## LEGAL DEFINITIONS

16.    The following terms are relevant to this affidavit in support of this application for a search warrant:

17.    *Computer*: The term "computer" refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, mobile phones and devices, and tablets. See 18 U.S.C. § 1030(e)(1).

18.    *Electronic mail ("e-mail" or "email")*: "E-mail" refers to a method of exchanging digital messages from an author to one or more recipients. Users may attach digital media to their e-mails. Modern e-mail operates across the Internet or other computer networks. E-mail systems are based on a store-and-forward model. Email servers accept, forward, deliver and store messages. E-mail accounts may be accessed by computers, to include smartphones and tablets.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20.    *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

6

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device to produce child pornography, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

7

21.     *Nature of examination*. Based on the foregoing, and consistent with Rule 41 (e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

22.     *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **TECHNICAL TERMS**

23.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Based on my training and experience, the technical terms identified in this paragraph convey the following meanings:

  a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.

These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.       Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.       Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**PROBABLE CAUSE**

24.    On or about December 23, 2022, the Farmington Resident Agency of the FBI was notified by NNDCI that a minor female identified by initials D.M. and year of birth 2013 (referred to herein as "JANE DOE") disclosed to her mother, identified by initials A.K. and year of birth 1985 (referred to herein as "WITNESS 1"), that her father had been inappropriately touching her, including digital and penal penetration. WITNESS 1 brought JANE DOE to the Northern Navajo Medical Center in Shiprock, NM to be evaluated. Hospital staff then reported the disclosures to NPD. JANE DOE's father was identified with initials S.M. and year of birth 1984.

25.    A child forensic interview was scheduled to occur on or about January 4, 2023. After the disclosures were reported to NPD, but prior to the scheduled child forensic interview, JANE DOE's father committed suicide. Law enforcement decided to proceed with the forensic interview to ensure JANE DOE was not at risk.

26.    On or about January 4, 2023, a child forensic interview was conducted with JANE DOE at the FBI Farmington Resident Agency. In addition to disclosing sexual abuse by her father, JANE DOE also disclosed she was sexually abused by her father's brother R. MAYS and her grandfather D. MAYS. JANE DOE disclosed R. MAYS raped her when she was six or seven years old. JANE DOE believed raped meant "sex." JANE DOE believed "sex" meant someone's private part going inside someone else's private part. JANE DOE had seen her parents have sex, and R. MAYS did it to her.

27.     The first time R. MAYS did anything to JANE DOE happened at R. MAYS's residence when WITNESS 1 left to go change the diaper of JANE DOE's sister in D. MAYS's residence. D. MAYS's residence is located immediately adjacent to R. MAYS's residence in vicinity of GPS coordinates N36.714077 W108.495567. JANE DOE was left alone with R. MAYS in R. MAYS's residence. R. MAYS touched JANE DOE slowly with his hands, a washcloth, and a small circular "little thingy," which was pointed on the end. R. MAYS poked JANE DOE's private part, which she used to pee, with his hand and the "little thingy," which hurt worse than when her dad did it because R. MAYS did it harder. When WITNESS 1 returned to R. MAYS's residence, she saw that JANE DOE's hair was all "bushy" and R. MAYS was holding a washcloth. WITNESS 1 asked R. MAYS "what are you trying to do?" R. MAYS responded, "nothing, nothing," before JANE DOE left and went to D. MAYS's residence. R. MAYS has ripped JANE DOE's clothes while pulling on her shirts.

28.     JANE DOE remembered this happening on at least five occasions, but probably more times than that. R. MAYS did this to JANE DOE when WITNESS 1 was either passed out or gone doing something. These events occurred in the back room of R. MAYS's residence where R. MAYS slept.

29.     R. MAYS also used a "soft circle thing" that looked like a pencil to poke JANE DOE's private parts. It burned when R. MAYS poked her with it. JANE DOE also disclosed that R. MAYS used other things to poke her private part, including a pink round machine with circles that had a glass tube thing, kind of like a water bottle. The pink round machine reminded JANE DOE of an ad she saw while watching "nasty movies" with her father. The machine was like a little tongue and would pick at JANE DOE's "pee thing" and make her private part feel weird and

numb. During the interview, JANE DOE drew sketches of multiple sex devices her father and R. MAYS used on her. R. MAYS put clear oil on the devices when he used them with JANE DOE.

30.     JANE DOE called R. MAYS's private area the "ball and nuts." JANE DOE was in R. MAYS's residence on a tiny bed in the front of R. MAYS's residence when R. MAYS tried to put his "ball and nuts" in JANE DOE's private part. R. MAYS would stick his tongue out and lick JANE DOE slowly. R. MAYS would use his tongue to go up and down over and over again on JANE DOE's private part. R. MAYS would also try to make JANE DOE kiss his ball, but JANE DOE would say no. R. MAYS would then grab her head and force her down on him anyway. JANE DOE would kick and bite R. MAYS to get him to stop putting his private part in hers. On one occasion, R. MAYS tried to make JANE DOE lay on him, but JANE DOE jumped up and landed on R. MAYS, which was how R. MAYS broke his arm.

31.     Sometimes R. MAYS would put his private part into JANE DOE's private part when she was sleeping. Usually, R. MAYS would get on top of JANE DOE while she was sleeping and "push it in." JANE DOE would wake up, make a noise, and kick R. MAYS. It would burn and hurt when R. MAYS put his private part in her. R. MAYS would not be wearing any clothing when he did this.

32.     R. MAYS and D. MAYS would also show JANE DOE "nasty videos" of girls doing "weird stuff" and showing their boobs. R. MAYS would use WITNESS 1's cell phone to show JANE DOE "nasty videos." One video R. MAYS showed JANE DOE was of a black lady doing "nasty stuff" with a black guy. They were kissing their private parts and "having nasty stuff." The individuals in the video were also using a machine that looked like a cake mixer that massaged "down there," while indicating JANE DOE's crotch area.

13

33.     D. MAYS had JANE DOE's father's silver Chromebook computer and used it to show "nasty videos" to JANE DOE. D. MAYS also used an apple cell phone to show JANE DOE "nasty videos." D. MAYS showed JANE DOE videos of ladies with their private areas. D. MAYS showed JANE DOE a video of a lady with "big fat boobs" doing "nasty stuff" with a guy.

34.     During the same interview, JANE DOE disclosed that D. MAYS would use his hands to grab JANE DOE's private parts. The last time D. MAYS touched JANE DOE, WITNESS 1 was off drinking and driving. D. MAYS would touch JANE DOE in his bedroom at D. MAYS's residence. R. MAYS would pull JANE DOE's shirt up and her pants down so he and D. MAYS could both touch her.

35.     On or about January 5, 2023, JANE DOE disclosed to staff at the Children's Crisis Shelter that she had "some bubbles," while pointing down at her groin. JANE DOE stated, "it was from my dad and my uncle. My dad has been raping me since I was 6 years old, until now. When my dad raped me, my uncle did it after him."

36.     On or about January 10, 2023, WITNESS 1 was interviewed by law enforcement. WITNESS 1 stated JANE DOE told her "it was just daddy," who did inappropriate things to her. WITNESS 1 stated R. MAYS had a cellular telephone with number 505-686-2659, which WITNESS 1 was temporarily using to contact people since she did not have her phone.

37.     On or about January 10, 2023, R. MAYS was interviewed by law enforcement. R. MAYS stated JANE DOE's father made accusations against him regarding sexual abuse of JANE DOE around Christmas two years previously. R. MAYS also stated he never had any contact with JANE DOE that could have been considered sexual. R. MAYS stated he did not go anywhere near JANE DOE and her younger sister. R. MAYS provided telephone number 505-686-2659 as his cellular telephone number.

38.     On or about January 25, 2023, JANE DOE's grandmother, identified with initials B.M. and year of birth 1951 (referred to herein as "WTINESS 2"), was interviewed by law enforcement. WITNESS 2 stated JANE DOE moved back into WITNESS 2's house about a year and a half ago. When JANE DOE moved back in, WITNESS 2 took her to the hospital to get her checked out. JANE DOE was inspected and had been raped sometime while she was living at the property of R. MAYS and D. MAYS. At that time, the only people living on the property were R. MAYS, WITNESS 1, D. MAYS, JANE DOE, and JANE DOE's younger sister. WITNESS 2 stated R. MAYS got blamed for raping JANE DOE, which was why WITNESS 2 was told she had to take care of the girls. JANE DOE told WITNESS 2 directly that she had been raped by R. MAYS and D. MAYS while at their property. JANE DOE told this to WITNESS 2 after she moved back in with WITNESS 2 about a year previously.

39.     WITNESS 1 moved back and forth between R. MAYS's residence and WITNESS 2's residence, where JANE DOE's father lived, over the past few years. JANE DOE lived with WITNESS 1 at R. MAYS and D. MAYS's property on and off during this period. WITNESS 1 and JANE DOE primarily lived in R. MAYS's residence while at the property but would also spend time in D. MAYS's residence.

40.     On or about January 25, 2023, R. MAYS's brother, identified with initials H.M. and year of birth 1987 (referred to herein as "WITNESS 3"), was interviewed by law enforcement. WITNESS 3 stated on one occasion when he was staying at WITNESS 2's house visiting sometime last year before the summer, JANE DOE told him that she did not like R. MAYS because he did something bad. JANE DOE then changed the subject and would not tell WITNESS 3 what R. MAYS did.

41.     On or about February 1, 2023, JANE DOE disclosed to staff **at the Children's Crisis Shelter** that R. MAYS would touch her chest and that he did it more than 11 times. R. MAYS would do this in the bathroom or in front of his residence. R. MAYS would do it when WITNESS 1 would pass out or if she had to go to the store.

42.     On or about February 8, 2023, law enforcement conducted a second interview with WITNESS 1. WITNESS 1 stated there were times during the previous fall, while WITNESS 1 and JANE DOE were staying with R. MAYS at R. MAYS's residence, when R. MAYS and WITNESS 1 would argue. During some of these arguments, WITNESS 1 would go outside into the storage shed to get away from R. MAYS, leaving JANE DOE and her younger sister inside R. MAYS's residence alone with R. MAYS.

43.     JANE DOE told WITNESS 1 in the past that R. MAYS had "done things" to her but did not want to give details. On one occasion over a year ago, WITNESS 1 left JANE DOE alone with R. MAYS in R. MAYS's residence **while she went to D. MAYS's residence for a brief period to change her younger daughter's diaper**. When WITNESS 1 returned to R. MAYS's residence, she noticed eye contact between R. MAYS and JANE DOE in addition to JANE DOE's hair being kind of "wild." WITNESS 1 asked JANE DOE if R. MAYS did that to her hair to which JANE DOE responded yes but would not specify what happened.

44.     WITNESS 1 also stated there were times when she drank to the point she passed out and did not know what happened while she was passed out. WITNESS 1 was drinking quite a bit while staying at R. MAYS's residence but did not know how often she passed out.

45.     R. MAYS did not let WITNESS 1 be alone. R. MAYS threatened WITNESS 1 to not go anywhere and not to "say shit." WITNESS 1 believed R. MAYS was afraid she would tell

law enforcement that she believed JANE DOE's allegations against R. MAYS. R. MAYS hit WITNESS 1 in the past when she confronted R. MAYS about the allegations made by JANE DOE.

46.     To WITNESS 1's knowledge, R. MAYS never helped JANE DOE take a bath or change clothes.

47.     According to WITNESS 1, R. MAYS did not have any sex devices in his residence. WITNESS 1 and R. MAYS were romantically involved, but R. MAYS never used any sex devices when they were intimate. WITNESS 1 stated she would know if R. MAYS had any sex devices, and he did not have any. WITNESS 1 also stated that certain cabinets in R. MAYS's residence were locked and WITENSS 1 did not have access to them to know what was in them.

48.     WITNESS 1 found drawings made by JANE DOE in the cupboards of R. MAYS's residence depicting a man's body with his "thing." WITNESS 1 previously stated during her first interview that JANE DOE had made drawings of ladies with big boobs, a cat with boobs, and a cat's vagina.

49.     WITNESS 1 knew that R. MAYS had thousands of porn videos on his phone, but JANE DOE never said anything to WITNESS 1 about R. MAYS showing the videos to her. R. MAYS also had a file folder on his cell phone that was locked with a password. WITNESS 1 was the one who set the code for R. MAYS's phone and knew what the code was, but the code to get into the specific folder was different. WITNESS 1 did not know what was stored in the locked folder on R. MAYS's cell phone.

50.     Based on my training and experience, perpetrators of sexual abuse frequently take and maintain photos and videos of their victims and even the sexual acts themselves. Perpetrators of sexual abuse also show pornography to their victims as a means to groom their victims. Perpetrators frequently maintain digital files or folders containing such images and video on

various electronic devices such as computers, tablets, cell phones, USB drives, storage discs, and cloud based storage. Extra precautions such as discrete or misleading programs and applications, hidden files, or security measures including passwords are often used hide or secure such content. Electronic devices such as cell phones commonly contain devices such as SD cards and SIM cards designed to store additional data in conjunction with any data storage capabilities integrated directly into the electronic device itself.

51.     On or about February 8, 2023, law enforcement conducted a second interview with R. MAYS at the SJCSO. During this interview, R. MAYS stated the last time WITNESS 1 and JANE DOE came over to his residence right before Christmas, WITNESS 1 brought a pink vibrator thing that she got from JANE DOE's father. R. MAYS thought WITNESS 1 was trying to set him up for something with the vibrator.

52.     R. MAYS also stated that JANE DOE would go on her dad's phone and watch the porn videos that her dad was watching. JANE DOE told R. MAYS that her dad made her watch the videos.

53.     R. MAYS again stated he never touched JANE DOE nor any other young girl. R. MAYS stated JANE DOE was lying about R. MAYS touching her. R. MAYS stated the interview was a waste of time and that he had other things he needed to do and terminated the interview.

54.     On or about March 16, 2023, law enforcement officers executed two search warrants issued in United States District Court, District of New Mexico on the property located in vicinity of GPS coordinates N36.714077 W108.495567: one search warrant for the residence and person of D. MAYS (23-MR-587), and one search warrant for the residence and person of R. MAYS (23-MR-586). The TARGET DEVICES listed previously and in Attachment A were collected during the execution of these search warrants on March 16, 2023.

55.     Based on my training, experience, and research from consulting the manufacturer's advertisements and product technical specifications, I know that the TARGET DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, GPS navigation device, and are capable of connecting to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, where the user was located at specific times, communications between different parties over various communication platforms, and various types of media such as photographs and videos.

56.     Additionally based on my training, experience, and research from consulting the manufacturer's advertisements and product technical specifications, I know that the TARGET DEVICES have capabilities that allow them to be used as both digital cameras, as well as storage devices for images, photographs, and other media. The TARGET DEVICES are capable of accepting the transfer of images, photographs, and other media from other computers or devices.

## OFFENDER CHARACTERISTICS

57.     Based on my training and experience related to child exploitation and sexual assault investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who create and/or possess photographic evidence of their crimes:

> a.  Computers and computer technology, including cellular technology have revolutionized how sexually explicit material is obtained, solicited, produced, distributed, and utilized.

> b.  Such individuals may receive sexual gratification, stimulation (including erectile function), and satisfaction from having sexual contact with persons

who are unable to consent to the sexual contact, or from fantasies they have viewing non-consenting persons in sexually suggestive poses, such as in person or in photographs.

c.      Offenders maintain or store sexually explicit material in a variety of ways. For instance, such persons may store this material on computers, including smartphones, mobile phones and devices, storage devices (including USB drives) and tablets. Such individuals often maintain their pornography material in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.

d.      Importantly, evidence of such activity, including deleted pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

e.      Such individuals often transfer electronic files containing pornography from device to device, either to make room on their devices, or for long-term storage.

f.      I also know from training and experience that some persons who create and/or possess pornography or photographic evidence of their sexual crimes engage in "collector behavior." Persons who are "collectors" of pornography or photographic evidence of their sexual crimes often keep the material in their possession for years because it is considered valuable to them. They may receive sexual gratification, stimulation (including erectile

function), and satisfaction from reviewing the photographs and videos they created.

g.      "Collectors," in order to prevent their valuable images from being lost, stolen, damaged, or corrupted, will often transfer images to other devices capable of media storage, and may store their images on multiple devices. They may also remove the images from the devices they use on a daily basis to other devices, such as computers, cell phones, or other external storage devices, to avoid the images being seen by others. "Collectors" rarely permanently delete their collection of illicit photographs, videos, and images.

h.      Given the disclosures by JANE DOE and information provided by WITNESS 1 regarding R. MAYS and D. MAYS's histories of downloading, saving, and viewing pornographic images on multiple electronic devices such as cell phones and laptop computers, I believe they exhibit "collector" behavior. In addition, WITNESS 1 said that R. MAYS also had a file folder on his cell phone that was locked with a password. WITNESS 1 did not know what was stored in the locked folder on R. MAYS's cell phone.

i.      Additionally, it is reasonable to believe that digital content could have been shared or transferred between R. MAYS and D. MAYS and the electronic devices they possessed due to their close relationship, physical proximity of their residences, and allegations of sexual acts simultaneously conducted by R. MAYS and D. MAYS.

21

j.      I also know from training and experience that offenders may show minors sexually explicit material as a method of grooming and normalizing sexual behavior, and, as a means of encouraging the child to engage in sexual activity with the offender.

k.      JANE DOE disclosed behavior consistent with this method of grooming. R. MAYS would use WITNESS 1's cell phone to show JANE DOE "nasty videos." R. MAYS and D. MAYS would also show JANE DOE "nasty videos" of girls doing "weird stuff" and showing their boobs. D. MAYS took JANE DOE's father's silver Chromebook computer and used it to show "nasty videos" to JANE DOE. D. MAYS also used an apple cell phone to show JANE DOE "nasty videos."

## CONCLUSION

58.     In sum, JANE DOE disclosed to a forensic interviewer that she was sexually abused by R. MAYS on several occasions, that R. MAYS used instruments that are likely sex toys during the commission of the sexual acts, and R. MAYS and D. MAYS showed her pornographic videos on multiple electronic devices. JANE DOE disclosed to WITNESS 2 she was also raped by both R. MAYS and D. MAYS.

59.     Based on the facts set forth in this affidavit, there is probable cause to believe violations of United States Code Title 18 §1153 – Offenses committed within Indian country, §2241(c) - Aggravated sexual abuse, and §2244(a)(5) - Abusive sexual contact were committed by R. MAYS and D. MAYS, and that evidence, contraband, instrumentalities and/or fruits of violations of such crimes may be contained in the TARGET DEVICES.

60.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

61.     Given that the TARGET DEVICES are contained on the premises of the FBI Farmington Resident Agency, located at 215 W. Elm Street, Farmington NM, 87401, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

62.     Assistant United States Attorney Caitlin L. Dillon, District of New Mexico, reviewed and approved this affidavit for legal sufficiency to establish probable cause.

63.     I swear that this information is true and correct to the best of my knowledge and belief.

_____
Travis A. Kosir, Special Agent
Federal Bureau of Investigation


Sworn telephonically, signed remotely, and transmitted by email this  30th day of March 2023.

_____
The Honorable B. Paul Briones
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1.    The property to be searched include the following electronic devices, as well as any and all storage devices contained within the electronic devices such as SIM cards, SD cards, or other removable digital storage devices, which were collected during the execution of United States District Court, District of New Mexico search warrants Case No. 23-MR-586 and Case No. 23-MR-587, at two residences located in vicinity of GPS coordinates N36.714077 W108.495567 on March 16, 2023. TARGET DEVICE "a" listed below, identified as a Pixel 2 XL smartphone, was collected from the residence of R. MAYS (search warrant Case No. 23-MR-586). All other TARGET DEVICES listed below were collected from the residence of D. MAYS (search warrant Case No. 23-MR-587).

a.    Pixel 2 XL smartphone, IMEI: 358035086070350

b.    iPhone SE, serial number LXD4J40X25, IMEI: 357933319711793

c.    TCL flip phone, model 4056SPP, IMEI: 015855002901775

d.    Samsung cell phone, model SGH-S125G (GP), serial number R21D421LHTL, IMEI: 356727/05/064857/3

e.    LG flip phone, model LG-VN251SNPP, serial number 410CYPY0117032

f.    Sky Devices smartphone, model Elite D5 Max, IMEI 1: 354403390221487

g.    Amgoo cell phone, model AM242, IMEI 1: 357638060870777, IMEI 2: 357638060870785

h.  Blu cell phone, model C5L, serial number 5090018021050227, IMEI 1: 355449106835325, IMEI 2: 355449106835333

i.  PCD cell phone, model P41, serial number P412201001607, IMEI: 352781120066153

j.  Unnecto cell phone, model U618 Quattro M2, IMEI 1: 356814082107917, IMEI 2: 356814082107925

k.  Samsung smartphone, IMEI: 354762612095445

This warrant authorizes the forensic examination of the TARGET DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

**Particular Things to be Seized**

All records, in whatever format, on the TARGET DEVICES described in Attachment A that relate to violations of United States Code Title 18 §1153 – Offenses committed within Indian country, §2241(c) - Aggravated sexual abuse, and §2244(a)(5) - Abusive sexual contact that involve R. MAYS and/or D. MAYS and are related to content regarding JANE DOE including:

    a.    All visual depictions (including images, videos, negatives, still photos, video tapes, artists drawings, slides and any type of computer formatted file) which depict sexual conduct, or the lewd exhibition of genitalia, or posed or candid in a sexual manner, including clothed or partially clothed.

    b.    All documentation related to computer passwords, encryption keys, and other access devices.

    c.    All documents, web history, and communications demonstrating any communication or correspondence with any person or groups of persons supplying, distributing, or trading in sexually explicit materials, or discussing a sexual interest.

    d.    Bookmarks, internet history, temporary internet files, .1nk files, cache files, and other items showing how the computer was accessed, who accessed the computer, and/or how the computer was utilized.

    e.    All evidence related to off-site storage of electronic data, such as cloud-based servers, including usernames, passwords, account information and access logs.

f.      Records of Internet Protocol addresses used.

g.      Records of Internet activity, including firewall logs, caches, browser history and

cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, and records of user-typed web addresses.

h.      Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history.

i.      This warrant authorizes a review of electronic storage media and electronically

stored information seized or copied pursuant to this warrant in order to locate

evidence, fruits, and instrumentalities described in this warrant. The review of this

electronic data may be conducted by any government personnel assisting in the

investigation, who may include, in addition to law enforcement officers and

agents, attorneys for the government, attorney support staff, and  technical

experts. Pursuant to this warrant, the FBI may deliver a complete copy of the

seized or copied electronic data to the custody and control of attorneys for the

government and their support staff for their independent review.